Estate of Clara Stundon, Deceased, Jerry Archer, Don Demorey, George Upton, Co-Executors, et al. [1] v. Commissioner. Estate of Stundon v. Commissioner
Docket Nos. 2942-68, 4547-68 - 4549-68.
United States Tax Court
T.C. Memo 1970-20; 1970 Tax Ct. Memo LEXIS 340; 29 T.C.M. (CCH) 62; T.C.M. (RIA) 70020; January 28, 1970, Filed *340 Joseph D. Holmes, Jr., Fourth Ave., Seattle, Wash., for the petitioners. Stephen E. Silver, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for calendar years 1964, 1965, and 1966 in the following amounts: Docket No.
Petitioners
Year
Deficiency (Overassessment)
2942-68
Estate of Clara Stundon
1964
$4,917.37
1965
(3,959.51)
1966
182.08
4547-68
Mary C. Sainsbury
1964
195.93
1966
323.64
4548-68
George F. Sainsbury
1964
194.72
1966
326.88
4549-68
George F. and Mary C. Sainsbury
1965
1,303.39
The only issue for decision is whether an agreement which purports to be a lease, is, for tax purposes, "a sale in effect" or a bona fide lease. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Clara Stundon ("Clara") filed a separate individual income tax return for taxable year 1964 with the district director of internal revenue, Tacoma, Washington. The Estate of Clara Stundon, *341 Deceased, filed Federal income tax returns for taxable year 1965 and for the taxable period January 1, 1966, to February 15, 1966, with the district director of internal revenue, Tacoma, Washington. George F. Sainsbury ("George") and Mary C. Sainsbury ("Mary") are husband and wife. Hereinafter they will sometimes be referred to as "the Sainsburys." They resided in King County, State of Washington, at the time their petitions in this case were filed. George filed separate income tax returns for taxable years 1964 and 1966 with the district director of internal revenue, Tacoma, Washington. Likewise, Mary filed separate income tax returns for these years with the same district director. For the year 1965 Mary and George filed a joint income tax return with the Tacoma district director. For many years prior to 1964 Clara owned and operated the Arcadia Apartments ("the Arcadia"), a 41-unit apartment house in Seattle, Washington. 63 By profession, George is a consulting engineer. Mary and he have owned and operated one to three small apartment houses in Seattle for over 20 years. During this period, George has been active in the management of the apartments. On or about January 27, 1964, George *342 executed a document entitled "EARNEST MONEY RECEIPT AND AGREEMENT." George was seeking to purchase the Arcadia from Clara. The document stated that George was offering to purchase the Arcadia for $240,000, as follows: $25,000.00 down on closing including above receipted for earnest money, and balance of purchase price ($215,000.00) payable on a real estate contract with terms of $1200.00 or more per month including interest at 6% per annum computed on the diminishing principal balances, first payment due 30 days from date of closing. On or about February 1, 1964, Clara made changes and additions to the foregoing agreement of January 27, 1964. She redrafted the agreement so that the purchaser rather than the seller would pay the agent's commission. Other changes proposed by Clara were the following: Seller reserves the right to modify the transaction described in attached Earnest Money Receipt and Agreement to a Lease-Option agreement for the period until March 1, 1966, with the irrevocable and absolute provision that a real estate contract will be executed by the parties hereto on the terms and conditions as described in attached Earnest Money Receipt and Agreement. In the *343 event that such Lease-Option agreement shall be executed, payments so made under this said Lease-option shall be credited in the same fashion as though payments were made on the contract the terms of which are: A purchase price of $240,000.00 with down payment of $25,000.00, and balance payable at the rate of $1200.00 or more per month including interest at the rate of 6% per annum computed on the diminishing principal balances. The lease with option to purchase arrangement was proposed by Clara because she had reservations concerning the financial ability of the Sainsburys to make the installment payments on the purchase price. If the Sainsburys could establish their financial ability to perform the terms of the lease for a 25-month period, then Clara was willing to sell the Arcadia to them. In proposing a lease with option to purchase rather than a present outright sale, Clara was taking cognizance of the law of the State of Washington regarding forfeiture actions. When real property is sold in the State of Washington by real estate contract, the vendor may declare a forfeiture for nonpayment *344 of any installment where time is made of the essence. However, to obtain ultimate possession of the real property, a forfeiture action must be commenced by the vendor against the contract vendee in the Superior Court of the State of Washington. Generally, after a forfeiture occurs, it may take the contract vendor as much as nine to twelve months to get the forfeiture action heard by the court so that the court can declare the forfeiture effective. During this period, the contract vendee has the right to retain possession of the premises. Even though a valid notice of forfeiture is given by the contract vendor, the courts in the State of Washington have nevertheless permitted a period of grace during which time the vendee can comply with the terms of the real estate contract where the equities of the particular case warrant it. The change in the form of the transaction to that of a lease for the first 25 months could facilitate repossession in the event the Sainsburys failed to make a monthly installment. As noted above, exercise of the option was conditioned upon the lease being "in good *345 standing at the time notice of exercise of option is given." On February 10, 1964, George prepared and signed another instrument entitled "EARNEST MONEY RECEIPT AND AGREEMENT', which provided, inter alia: Total Purchase price is Two Hundred Forty Thousand and no/100…… DOLLARS ($240,000.00) payable as follows: $25,000.00 down on closing including above receipted for earnest money, and balance of purchase price ($215,000.00) payable on a real estate contract with terms of $1200.00 or more per month including interest at 6% per annum computed on the diminishing principal balances, first payment due 30 days from date of closing; and contract payable in full on or before 20 years from date of contract. 2. Purchaser further agrees, at seller's request, to join with seller and sign any necessary papers to enable seller to obtain the largest possible mortgage loan on subject property provided however amount of loan, required monthly payments and rate of interest thereon do not exceed those of contract. Seller reserves the right to modify this transaction to a Lease-Option agreement for the period until March 1, 1966, with the irrevocable 64 and absolute provision that a real *346 estate contract will be executed by the parties hereto on the terms and conditions as described herein. The seller will deliver to the purchaser a policy of title insurance at the end of the 24 month period hereinabove outlined, and purchaser will be supplied with a preliminary title insurance policy report at time of execution of lease-option. 3. In the event that such lease-option agreement shall be executed, payments so made under this said lease-option shall be credited in the same fashion as though payments were made on the contract with terms of: purchase price of $240,000.00, down payment of $25,000.00, balance payable at the rate of 6% per annum computed on the diminishing principal balances. 4. Purchaser will pay commission to agent herein, Capretto & Clark Inc., on closing based on the price of $240,000.00 in an amount of 6% of 1st $100,000 plus 3% of amt. over $100,000 of purchase price, said commission to be paid separately and in addition to purchase price. On February 10, 1964, Clara executed a letter agreement which read in part: I agree to the terms of the attached Earnest Money Receipt and Agreement dated February 10, 1964, which has been signed by G. Sainsbury *347 and Mary C. Sainsbury, his wife, subject to the following modifications: (1) Furniture in the apartment I occupy is not considered furniture used in the operation of the apartment house and is not part of the property being sold. * * * (3) The transaction will be completed so that the purchasers will have a lease-option agreement under the terms of which the purchaser will lease the premises from me for a period of two years making a lease deposit of $25,000 which lease deposit will be credited upon the rent during the two-year period at the rate of $1,000 per month. Rent during the two-year period will be at the rate of $2,200 per month. During the 24th month purchaser will have the option to purchase the premises under real estate contract. The exact price and downpayment which would be applicable at that time is to be computed so that the option price and downpayment would leave the purchaser the same balance it would have owing under a real estate contract entered into at this time with a price of $240,000, downpayment of $25,000 and balance payable at $1200.00 per month including interest at 6% per annum computed on diminishing balances. Lease form to be executed shall be *348 on a standard form to be approved by both purchasers and seller. The lessee shall pay all insurance premiums and taxes during the period of the lease in addition to the monthly rent provided. Purchaser shall not be entitled to exercise the option unless the lease is in good standing. In the event the lease is terminated, the option to purchase shall also terminate. On April 8, 1964, Clara and the Sainsburys entered into a lease agreement requiring monthly payments of $2,200. The Sainsburys paid $1,200 in cash each month and another $1,200 in cash each month and another $1,000 was applied monthly against the balance of the $25,000 payment made by the Sainsburys to Clara in April 1964. The Sainsburys did not receive a title insurance policy at the time the lease was entered into. The parties agreed that the Sainsburys would receive a purchaser's policy of title insurance if the option were exercised and the real estate contract became effective. The lease included the following: 25. Lessee shall pay all real estate and personal property taxes on said property and shall in addition keep said property insured against fire with extended coverage in the amount of $200,000, with said *349 policy to include lessor as a named insured. Lessee shall also carry public liability insurance for said premises in an amount of not less than $100,000, naming lessor as a named insured. Copies of such policies shall be furnished to lessor. 26. Lessee shall have the option of purchasing said property between April 1, 1966 and April 30, 1966 for the total price of $212,880. Written notice of intent to exercise such option shall be given lessor by personal service or registered mail to her last known address which she will furnish lessees no later than April 30, 1966 in the event lessee desires to exercise such option. Such option may not be exercised unless this lease is in good standing at the time notice of exercise of option is given. In the event lessee exercises such option, the purchase price shall be paid $1,200 down and the balance with interest on deferred balances at 6% per annum from May 1, 1966, in monthly installments of $1,200 or more at purchaser's option. Sale shall be completed by execution of contract on the form attached hereto as Exhibit B. 27. In the event of the damage or destruction of the premises by fire as set forth in paragraph 12 and/or in the event *350 of the taking of said property under powers of eminent domain by public authority as set forth in paragraph 21, then 65 notwithstanding the provisions of said contract this lease shall be construed as if the lessees had exercised their option for the purchase of said property and the fire and eminent domain proceeds shall be paid to the parties as their interest may appear. Attached to the lease was an instrument designated "REAL ESTATE CONTRACT" dated May 1, 1966, but executed by Clara and the Sainsburys on April 8, 1964. The contract reflected the agreement of February 10, 1964. On October 8, 1964, Clara's attorney, Bertil Granberg, delivered to the Seattle Trust & Savings Bank a copy of the "Lease" dated April 1, 1964, the original and duplicate executed copies of the real estate contract dated May 1, 1966, and a statutory warranty deed signed by Clara on April 8, 1964. The statutory warranty deed was a fulfillment deed which would not be given to the Sainsburys until the terms of the real estate contract were carried out. Clara died on February 15, 1966. On or about March 8, 1966, the attorneys for the Sainsburys delivered to her executors a letter notifying them of *351 the Sainsburys' intent to exercise their option to purchase the Arcadia. When the lease agreement was entered into, the Sainsburys paid to the agent a commission of $10,200. They did not amortize said amount over the 25-month period from April 1, 1964, through April 30, 1966. Instead, the commission was allocated for depreciation purposes to the cost of the land and building for the first time in the Sainsburys' 1966 Federal income tax returns. During 1964, 1965, and 1966, the Arcadia continually incurred operating losses, even before deductions for depreciation of the building. The petitioners reported the transaction involved in this case as a lease of the Arcadia by Clara to the Sainsburys from April 1, 1964, to May 1, 1966, at which time the Sainsburys exercised their option to purchase the Arcadia. For the periods involved, Clara reported all amounts received from the Sainsburys as rental income and claimed deductions for depreciation of the Arcadia. The Sainsburys claimed rental deductions for all amounts paid to Clara. Both parties reported the sale and purchase of the Arcadia as of May 1, 1966. In the notices of deficiency, respondent determined that Clara sold the *352 Arcadia to the Sainsburys on April 1, 1964, instead of May 1, 1966. This determination resulted in the disallowance of depreciation deductions claimed by Clara and rental deductions claimed by the Sainsburys, elimination of rental income reported by Clara from the Arcadia, increase of interest deductions to the Sainsburys, and increase of interest income and capital gains of Clara from the payments received from the Sainsburys. The net deficiency produced by these adjustments for the entire 25-month period, April 1, 1964, to May 1, 1966, is $1,039.94 to Clara and $2,344.56 to the Sainsburys. [2]
*353 Opinion The sole issue for decision is whether a transaction whereby real property is transferred pursuant to a document which purports to be a 25-month lease with an option to purchase constitutes, for Federal tax purposes, a sale or a lease. Under said document, the Sainsburys leased the Arcadia for a 25-month term. In the final month of the lease, the Sainsburys could exercise an option to purchase the property. They eventually did exercise their option to purchase the Arcadia for a total price of $240,000. The rent which they had previously paid was applied first against interest accruing over the term of the lease and the balance against the purchase price. In determining whether the document in dispute should be treated as a lease for Federal tax purposes, the Court of Appeals for the Ninth Circuit in (C.A. 9, 1955), has stated: However, the test should not be what the parties call the transaction nor even what 66 they may mistakenly believe to be the name of such transaction. What the parties believe the legal *354 effect of such a transaction to be should be the criterion. If the parties enter into a transaction which they honestly believe to be a lease but which in actuality has all the elements of a contract of sale, it is a contract of sale and not a lease no matter what they call it nor how they treat it on their books. * * * Also see , where we reiterated that the position of this Court is that documents entitled leases with options to purchase are to be construed to be what they are in substance in determining whether payments thereunder are rental payments or are payments toward the purchase of the property. Although there are provisions in the agreement which support the position of respondent as well as petitioners, we have concluded that a sale did not occur at the time the lease was entered into. The Sainsburys held merely an option to purchase the Arcadia. There was no assurance that the Sainsburys would exercise the option. In fact, the possibility existed that they would not do so. During 1964, 1965, and 1966, the Arcadia continually *355 incurred operating losses, even before deductions for depreciation of the building. At the end of the 25-month lease period, the Sainsburys might have decided to back away from the transaction rather than pour any more of their money into an unprofitable business venture. Thus, the facts of the instant case are similar to the facts associated with the Neff property in In that case we noted that there was no agreement requiring the lessees to purchase the property. Also in that case, as well as in the instant case, if the lessees chose to exercise their option to purchase, there would be required a substantial additional payment over and above the credit from the rental payment. This conclusion is further supplemented by the facts surrounding the manner in which the agreement reached its final form. It was Clara who insisted that there be a lease with an option to purchase rather than a sale. At first blush, her choice might seem surprising since it resulted in her receipts being taxed as ordinary income rather than as capital gains. Clara's prime consideration, however, was that she did not want to sell the Arcadia to the Sainsburys unless *356 they could establish their financial ability to make timely payments on the purchase price. It was Clara's understanding of local law that in the event of a default she could dispossess the Sainsburys more easily during the first two years if they were only lessees rather than vendees. Particularly, for that reason she rejected the Sainsburys' initial written offer to purchase the property and instead she insisted that they be tenants for the first two years. Likewise, she required a provision in the agreement that "[such] option may not be exercised unless this lease is in good standing at the time notice of exercise of option is given." See , affd. (C.A. 6, 1949), where we noted similarly that the rental payments were applicable upon the stipulated purchase price only in case the lessee had faithfully performed all conditions of the lease. Respondent has relied upon That case concerned a lease for more than 67 years, with an option at the end of the lease term to purchase for a nominal sum of $10. The Court of Appeals held that the transaction *357 was in substance a sale and that the payments in question should be treated for tax purposes as payments for the property rather than as rental payments. That decision is distinguishable from the case at bar. The instant case involves only a 25-month lease and the balance due upon exercise of the option was a substantial amount, $215,000. Decisions will be entered for the petitioners. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Mary C. Sainsbury, docket No. 4547-68; George F. Sainsbury, docket No. 4548-68; and George F. and Mary C. Sainsbury, docket No. 4549-68.↩
2. The greatest impact of the Commissioner's determination is not reflected by the adjustments contained in the deficiency notices. If the Commissioner's position that a sale took place on April 1, 1964, is sustained, the real impact will be the increased capital gains tax that the Estate of Clara Stundon will incur at the time the installment sale contract is distributed and the capital gain which has been deferred under the installment sale provisions is recognized. As the parties point out, if the Court held that a sale took place on April 1, 1964, the Commissioner must compute a capital gain of $200,825.32 on the Arcadia. However, if the Court holds that the sale took place on May 1, 1966, as the petitioners contend, there will be no gain because the basis of the Arcadia in the Estate of Clara Stundon will have increased to the $212,880 purchase price as a result of Clara's death on February 15, 1966.↩